**Opinion issued November 16, 2023**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-23-00450-CV

————————————

## IN THE INTEREST OF E.D., A CHILD

———————————————————————————————

**On Appeal from the 315th District Court**
**Harris County, Texas**
**Trial Court Case No. 2021-01279J**

———————————————————————————————

## O P I N I O N

The trial court rendered a decree terminating M.D.'s parental rights as to her youngest son. The mother appeals, arguing that the evidence is legally and factually insufficient to support the trial court's best-interest finding. We affirm the decree.

## BACKGROUND

The child at issue was born on August 9, 2021, at an estimated gestational age of 40 weeks. The Texas Department of Family and Protective Services took him into its care shortly after his birth because both he and the mother tested positive for cocaine in the hospital. Later, the Department sought termination of the mother's parental rights as to this child. The parties tried this parental-termination suit to the bench over the course of four nonconsecutive days: August 1, 2022; November 1, 2022; December 15, 2022; and February 16, 2023. Several witnesses testified.

Mae Sta Ana testified as the custodian of records for Memorial Hermann Southwest Hospital. Via this witness, the child's ad litem introduced the child's medical records into evidence. These records show that the child's meconium—his first stool after birth—tested positive for cocaine. The records also show that the mother tested positive for cocaine contemporaneously in her urine, but she denied any history of drug abuse and denied having used cocaine in this specific instance.

Bruce Jeffries testified as the owner and custodian of records for National Screening Services. During his testimony, the parties introduced records relating to the mother's drug tests.

Terri Holstead testified as the custodian of records for Texas Alcohol and Drug Testing Services. During her testimony, additional records relating to the mother's drug tests were introduced.

Together, the records from these two companies show that the mother took multiple drug tests during this suit, a number of which were negative for illegal drugs. But she tested positive several times throughout the suit, including for:

- cocaine in her urine sample on October 26, 2021;

- cocaine in her urine sample on November 9, 2021;

- cocaine in her urine sample on February 2, 2022;

- cocaine in her hair sample on April 1, 2022;

- cocaine in her hair sample on April 6, 2022;

- cocaine in her hair sample on July 7, 2022;

- methamphetamine in her urine sample on November 28, 2022; and

- cocaine and methamphetamine in her hair sample on December 15, 2022.

Jeffries testified that hair follicle tests show drug use within the last ninety days, whereas a urine test shows use within the last one to three days. Regarding the July 7, 2022 positive hair result, Jeffries opined that the result indicated more than a single use but not everyday use. Jeffries agreed that this result could be residual from prior cocaine use, and he also agreed that the mother tested negative for drug use later in July.

Jeffries was asked if substances can cause false positives. He unequivocally denied the possibility, stating that the technology being used "is at the highest level ever, so false positives are no longer in effect." In particular, Jeffries denied that medications can produce a false positive result for a different drug. So, for example,

if a patient is taking the prescription drug Metformin, Jeffries opined that it cannot produce a false positive result for methamphetamine. But Jeffries conceded that if a prescription drug contains amphetamine, by way of illustration, the amphetamine will be detected by the test.

Regarding the mother's positive test result for cocaine in her urine when the child was born, Jeffries stated it was impossible for this result to stem from earlier cocaine use when she was only five months pregnant (something the mother had claimed to be the case at one point in time). This would be true whether the positive drug test result was from her urine or from her hair.

Denise Bradley, a licensed professional counselor, testified about her counseling of the mother for substance abuse. Bradley started seeing the mother in December 2021 and stopped doing so in February 2022 because "her drug tests were all negative and she was doing very well." Bradley began seeing the mother again in March 2022 "because she had a relapse." Initially, the mother denied relapsing but then admitted using cocaine. Bradley stopped seeing the mother again in July 2022, having once again successfully counseled her for both parenting and substance abuse.

In July 2022, Bradley learned the Department was considering returning the child to the mother, and the Department asked Bradley her opinion. Bradley recommended family counseling. Bradley was going to conduct this family

counseling but ultimately did not do so because the mother relapsed once again. When Bradley discharged the mother from counseling in July, the mother took a drug test the same day. The test was positive for cocaine. Bradley was initially willing to counsel the mother again but decided against doing so because the mother denied using drugs despite the test result. In other words, Bradley declined to counsel the mother further because she was dishonest about her drug use. Without honesty, Bradley explained, it is impossible to help someone through counseling.

Bradley was asked whether she had concerns about the mother's honesty during counseling. Bradley said that she did not most of the time. Bradley testified that the mother "seemed very sincere" but also "was very hard to read." Bradley only thought the mother had lied about her drug use when "there was a positive drug test" that contradicted the mother as to her drug use.

Bradley testified that the mother spoke about her children—the child at issue as well as her older son who is not involved in this proceeding—during counseling. Bradley said the mother expressed love for her children. And the mother also made it clear that she wanted her children returned.

Bradley agreed that maintaining sobriety can be difficult and that a person who relapses can become sober again. But she testified that she has concerns about family reunification when a parent continues to test positive for drug use. Bradley opined that parental drug use puts children "at high risk" in that the mother could be

5

arrested, overdose, or be under the influence around the children. Bradley also stated that the children could get hold of the drugs and could be exposed to other people who are using illegal drugs.

When the mother testified, she acknowledged testing positive for cocaine while pregnant. She gave conflicting testimony as to how many times she used cocaine while pregnant, testifying once on one occasion and twice on another. In either case, the mother insisted that she did not know she was pregnant when she used cocaine. She also gave conflicting testimony as to how far along she was in her pregnancy when she used cocaine. Initially, she testified that she was about five months pregnant. Later, the mother claimed she did not know how far along she had been. Medical records contradict her first account; in a medical record, it states that the mother knew she was pregnant in January 2021, before the five-month mark.

The mother further acknowledged that she has a history of cocaine use. She testified that she first used cocaine sometime around 2012, after another of her sons died. Medical records state that the son in question died in 2011 at the age of three years old, having choked to death on a cherry pit. One of the mother's sisters was supervising this child when this happened.

The mother acknowledged that she went to rehab in 2016.

The mother also admitted she was charged with possession of cocaine in 2018 but explained that the drugs belonged to her husband. She performed court-ordered services, and the possession charge was later dismissed.

The mother said she began using cocaine again when her mother died in 2019 or 2020—the mother's testimony was conflicting as to the year. In her November trial testimony, the mother maintained she had only used cocaine once since her mother's death, the time when she was pregnant with the child. In her December trial testimony, however, the mother testified she had used cocaine four times between 2019 and her present testimony. She maintained in her December trial testimony that the last time she used cocaine was in March 2022. She attributed subsequent positive drug test results for cocaine to residual cocaine remaining in her hair sample reflecting prior use. She acknowledged testing positive for methamphetamine as well but characterized this result as a false positive from taking other medicines. That said, she agreed that she had not taken Desoxyn, the lone prescription drug that is methamphetamine and thus could cause a positive test result for that drug (per the testimony of Jeffries).

The mother testified she was maintaining sobriety. She said she understands she must remain sober for her children. After Bradley declined to counsel her further, the mother obtained a new therapist—Alvaro Solis. She is willing to continue seeing him to maintain her sobriety. However, during her final day of testimony in February

2023, the mother admitted that she had relapsed and used cocaine again in December 2022.

The mother acknowledged that she was told she would need to complete her family service plan to maintain her parental rights. She understood that maintaining her sobriety was a part of her service plan, and she agreed that she had failed to remain sober during this case. The mother further understood that being truthful with her service providers was part of her service plan, and she agreed that she failed to be honest with Bradley during counseling.

The mother acknowledged missing two or three drug tests. But she denied she failed to take these tests because she was using drugs. She said she missed one due to a broken phone and another due to not reading a message about the drug test in time to keep the appointment.

The mother testified that she has had the same apartment for a year-and-a-half. According to the mother, the Department and Child Advocates visited her apartment and did not request that she make any changes to it. She has a crib for the child, baby toys, and everything necessary for him.

The mother testified she has had a job installing carpet and flooring for a year and three months. According to her, this job provides enough income to support herself and her children. The mother further testified that in the future her friend Vivian could babysit the child when she works.

The mother testified that even if the child was not returned to her, a sister could take him. But she conceded that she had a falling out with one of her three sisters after their mother's death and that another sister has a substance-abuse problem. As to the third sister, the one the mother had in mind to care for the child, the mother agreed that she had not provided the Department with contact information for this sister. This third sister said she would take the child but only if she did not have to interact with child protective services.

The mother testified about her older son. He was 13 years old when she testified in December. According to the mother, her older son now resides with her friend Vivian and has done so since the mother tested positive for cocaine while pregnant with her younger son—at the insistence of "another social worker." Though the mother later clarified that her older son had returned to her custody for a three-month period due to COVID within Vivian's family, the mother said she did not recall which three months. Before her older son moved in with Vivian, he had lived with his mother. At present, she makes an effort to take this son to school every day.

Vivian Janitza Perdomo Morio, the mother's friend who cares for her older son, testified that she has known the mother for three years. According to Vivian, the mother comes to Vivian's home and makes breakfast for the older son each morning and then drops him off at school. The mother returns in the evening to make dinner for him. In addition, the mother visits on weekends, sometimes staying at

Vivian's home. The mother provides groceries for her older son. Vivian has never seen the mother under the influence of drugs, and Vivian could care for the mother's younger child if the mother could not. Vivian would be willing to take in this child.

On cross-examination, Vivian conceded that she had not been aware that the mother had used cocaine during the three years in which they have been friends. She agreed the mother's younger child deserves a sober parent.

Jasmine Bryant, the conservatorship worker assigned to the case, testified that the child first came into the Department's care after the mother and child both tested positive for cocaine when he was born. According to Bryant, the mother did not initially admit she had used cocaine while pregnant. The mother was provided with information for a substance-abuse program while she was in the hospital, but Bryant said the mother expressed no interest.

The Department provided the mother with a family service plan, which was made an order by the trial court. As part of this plan, the mother had to fulfill multiple requirements, several of which she completed. But these requirements also included substance-abuse counseling with Bradley, who unsuccessfully discharged the mother for testing positive and being untruthful about her drug use. To date, the mother has not successfully completed the substance-abuse counseling required by her court-ordered service plan.

Bryant testified that the major issue in this case has been and remains substance abuse. The Department informed the mother that her parental rights were at stake if she did not maintain her sobriety. Nevertheless, the mother had multiple positive drug tests during the pendency of this case. She also missed drug tests in August 2022 after testing positive for cocaine the month beforehand. Bryant found the mother's positive drug test results late in the case—November 2022 and afterward—to be especially concerning because they indicated lack of progress with respect to sobriety. During this case, the mother has not had six consecutive months of sobriety.

Bryant was also concerned about the mother's continued dishonesty as to her drug use. As long as the mother continues to be dishonest about drugs, she cannot get the help she needs from service providers, like Bradley. The mother already engaged in counseling with Bradley two different times unsuccessfully, and now is trying a third time with another counselor.

Bryant opined that it is in the child's best interest for the mother's parental rights to be terminated. Bryant reasoned that the child "needs to be able to live in a drug-free establishment" and the "the mother has not maintained sobriety." It would be difficult for the mother to care for him while under the influence of drugs.

Bryant stated the child has been in a foster placement since he left the hospital. This placement is the only home he has ever known. The child is "doing very well"

11

there and receives the "care and love" he needs. He appears bonded to the foster parents and calls them "mom" and "dad."

On cross-examination, Bryant agreed that she had been to the mother's apartment, which was clean, and that the mother had a crib for the child. Bryant had also verified the mother's lease and that she was employed. The mother has been consistent in terms of her home and employment.

Bryant acknowledged that the mother has consistently visited the child during the pendency of the case, missing only a few visits. During visits, the mother was appropriate, loving, and bonded with the child. The mother brought her older son during some visits. Bryant agreed that the mother's older son was very fond of and affectionate with the child. The two boys seem bonded, according to Bryant. Bryant also agreed that the mother has been very vocal about wanting the child returned.

Bryant testified the mother has not provided information for any relatives who potentially could care for the child. The first time Bryant heard of the possibility that one of the mother's sisters could care for the child was at trial, and the mother has not provided Bryant with the contact information for this sister.

Esther Gonzalez, the Child Advocates coordinator assigned to this case, testified that Child Advocates has been involved since October 2021. She testified that the child resides in a foster home, where he has been since the case's inception. According to Gonzalez, the child is "doing really well" in his foster home, which

12

consists of him and his foster parents. The child has bonded with his foster parents. The foster parents wish to adopt the child if he becomes available for adoption. In Gonzalez's opinion, the foster parents are meeting all of the child's physical and emotional needs. Child Advocates favors adoption because it is in the child's best interest to be in a safe, drug-free environment, which the mother has not been able to provide. Gonzalez stated that the mother has used illegal drugs throughout the case, noting that as recently as December 2022, the mother tested positive for drugs. Gonzalez also voiced concern about the mother's dishonesty about her drug use and "other dishonest statements" made during the case.

Gonzalez was questioned about a mediation that was held a few weeks before trial began. At this mediation, the parties negotiated a partial mediated settlement agreement concerning unsupervised visitation with the child. Child Advocates did not join this agreement because the mother had not demonstrated a six-month period in which she was sober. But Gonzalez conceded that both the mother and child seemed happy during visits, and that the mother is affectionate and appropriate during these visits. She agreed that the mother appears bonded with both of her children.

Gonzalez testified she had never been told that the mother's older son had resided with Vivian during the pendency of this case. Gonzalez said the first time she heard this was at trial. She stated she previously spoke with Vivian in July 2022,

and Vivian told her the older son lived with the mother. Gonzalez testified that the mother has never provided any information regarding the sister who ostensibly could care for the younger child.

The child's foster father testified. He stated that the Department placed the child in his home immediately after the child was discharged from the hospital. The child had been with him and his wife ever since. The three of them—the foster father, foster mother, and child reside together. Both foster parents work, so the child goes to an academy at a local church during the day. The child enjoys his time at the academy and has friends there.

The foster father described the child as "a very active little boy." At home, the child listens to music, sings, and watches Bluey—a cartoon. He plays with his toys, interacts with his foster parents, and is beginning to walk. The foster father testified that the child has bonded with him and his wife, noting that the child refers to them as "dada" and "mama," respectively. When they enter the room, the child "lights up, he laughs, he gets very excited." The foster father confirmed that he and his wife intend to adopt the child, if the biological mother's parental rights are terminated. He conceded that he and his wife had not discussed the possibility of visits between the child and his older brother, as this issue had not yet been brought to their attention.

After the four days of trial, the trial court briefly reopened the evidence on April 18, 2023, for the purpose of admitting into evidence an additional drug test result. The urine and hair samples in question were collected from the mother on the final day of trial—February 16, 2023. Both the mother's urine and hair tested positive for methamphetamine.

The trial court rendered a decree terminating the mother's parental rights as to the child (and also as to an absent father, who has not appealed). As predicate grounds for termination, the trial court relied on the mother's child endangerment, noncompliance with a court-ordered family service plan, use of an illegal drug in a way that endangered her son's health or safety, and causing him to be born addicted to an illegal drug. *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E), (O), (P), (R). The trial court also found termination was in the child's best interest. *See id.* § 161.001(b)(2). The mother now appeals from the trial court's decree.

## DISCUSSION

M.D. concedes the evidence suffices to support the trial court's findings that termination of her parental rights is warranted based on grounds of child endangerment, noncompliance with a court-ordered family service plan, use of an illegal drug in a way that endangered her son's health or safety, and causing him to be born addicted to an illegal drug. *See id.* § 161.001(b)(1)(D), (E), (O), (P), (R). But she contends the evidence is legally and factually insufficient to support the trial

15

court's finding that termination of her parental rights is in her son's best interest. *See id.* § 161.001(b)(2). M.D. maintains the evidence relating to her son's best interest consists almost entirely of conclusory opinions, not clear and convincing evidence.

**Legal Standard for Terminating Parental Rights**

A parent's rights to the care, custody, and management of his or her child are constitutional in scope. *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). But parental rights are not absolute; the Department may seek termination of the rights of those who are not fit to accept the responsibilities of parenthood. *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003). The primary focus in a termination suit is protecting the child's best interest. *Id.*

To terminate parental rights under the Texas Family Code, the Department must establish that a parent committed one or more statutorily enumerated predicate acts or omissions and that termination is in the child's best interest. FAM. § 161.001(b)(1)–(2). The Department need only establish one of these statutorily enumerated predicate acts or omissions, along with the best-interest finding. *See id.*; *In re A.V.*, 113 S.W.3d at 362. But the Department must make these showings by clear and convincing evidence. FAM. § 161.001(b). Clear and convincing evidence is "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007.

The best-interest inquiry is separate and distinct from the one concerning the predicate grounds for termination of parental rights. *In re A.J.D.-J.*, 667 S.W.3d 813, 821 (Tex. App.—Houston [1st Dist.] 2023, no pet.). But evidence used to prove predicate grounds for termination may be probative of a child's best interest. *In re A.A.A.*, 265 S.W.3d 507, 516 (Tex. App.—Houston [1st Dist.] 2008, pet. denied).

Multiple nonexclusive factors bear on a child's best interest. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These nonexclusive factors include:

- the child's desires;
- the child's emotional and physical needs now and in the future;
- the emotional and physical danger to the child now and in the future;
- the parental abilities of those seeking custody;
- the programs available to assist them to promote the child's best interest;
- their plans for the child or the plans of the agency seeking custody;
- the stability of the home or proposed placement;
- the acts or omissions of the parent that may indicate the existing parent–child relationship is not proper; and
- any excuse for the parent's acts or omissions.

*Id.*; *Yonko v. Dep't of Family & Protective Servs.*, 196 S.W.3d 236, 243 (Tex. App.—Houston [1st Dist.] 2006, no pet.). These nonexclusive factors are not exhaustive, no one factor is controlling, and a single factor may be adequate to support a finding that termination of the parent–child relationship is in a child's best

interest on a particular record. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002); *In re J.M.T.*, 519 S.W.3d 258, 268 (Tex. App.—Houston [1st Dist.] 2017, pet. denied).

In evaluating a child's best interest, we also may consider several factors set forth in section 263.307 of the Family Code. *In re D.L.W.W.*, 617 S.W.3d 64, 81 (Tex. App.—Houston [1st Dist.] 2020, no pet.); *see* FAM. § 263.307(a)–(b) (stating that prompt placement of child in safe environment is presumed to be in child's best interest and enumerating 13 factors courts should consider in deciding whether child's parents are willing and able to provide child with safe environment).

### Legal and Factual Sufficiency Review in Termination Cases

In this appeal, the sole issues are legal and factual sufficiency of the evidence. Due to the elevated burden of proof in a termination suit—clear and convincing evidence—we do not apply the traditional formulations of legal and factual sufficiency on appeal. *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018); *see also* FAM. § 101.007 (clear and convincing evidence is "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations").

In a legal-sufficiency review in a termination case, we cannot ignore undisputed evidence contrary to a finding, but we must otherwise assume the factfinder resolved disputed facts in the finding's favor. *In re A.C.*, 560 S.W.3d at 630–31; *see In re K.M.L.*, 443 S.W.3d 101, 112–13 (Tex. 2014) (reviewing court credits evidence supporting finding if reasonable factfinder could and disregards

18

contrary evidence unless reasonable factfinder could not). The evidence is legally insufficient if, viewing all the evidence in the light most favorable to a finding and considering undisputed contrary evidence, a reasonable factfinder could not form a firm belief or conviction that the finding is true. *In re A.C.*, 560 S.W.3d at 631.

In a factual-sufficiency review in a termination case, we must weigh disputed evidence contrary to a finding against all the evidence in the finding's favor. *Id.* We consider whether the disputed evidence is such that a reasonable factfinder could not resolve the conflicting evidence in the finding's favor. *Id.* The evidence is factually insufficient if, in view of the entire record, the disputed evidence that a reasonable factfinder could not credit in the finding's favor is so significant that the factfinder could not have formed a firm belief or conviction that the finding is true. *Id.*

In reviewing for evidentiary sufficiency, however, we must not usurp the factfinder's role. *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014). Deciding whether, and if so to what degree, to credit the evidence is the factfinder's role, not ours. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009). The factfinder is the sole arbiter of witness credibility. *Id.*; *In re J.S.*, 584 S.W.3d 622, 634 (Tex. App.—Houston [1st Dist.] 2019, no pet.). In a bench trial, the trial judge is the factfinder who weighs the evidence, resolves evidentiary conflicts, and evaluates witnesses' credibility. *In re R.J.*, 579 S.W.3d 97, 117 (Tex. App.—Houston [1st Dist.] 2019, pet. denied).

**Analysis**

The dispositive issue in this appeal is whether the mother's substance-abuse problem is severe enough for a factfinder to reasonably find by clear and convincing evidence that the termination of her parental rights is in her child's best interest.

Illegal drug use is a recurring theme in our parental-termination appeals. But evidence of drug use is not invariably legally and factually sufficient to support a finding that termination of parental rights is in a child's best interest. *In re A.J.D.-J.*, 667 S.W.3d at 825. For example, we have discounted evidence of a parent's illegal drug use when it occurred years beforehand. *See, e.g.*, *Yonko*, 196 S.W.3d at 245 (discounting mother's drug use because it had occurred before she became pregnant with child and many years before termination case); *In re B.M.R.*, 84 S.W.3d 814, 820 (Tex. App.—Houston [1st Dist.] 2002, no pet.) (discounting parents' substance abuse due to participation in Alcoholics Anonymous and Narcotics Anonymous and lack of evidence of abuse within last several years). We likewise have discounted evidence of a parent's illegal drug use when it was not recent, and he or she has shown significant progress in maintaining sobriety. *See, e.g.*, *In re D.L.W.W.*, 617 S.W.3d at 88–89 (discounting parents' drug use because they "had not tested positive for narcotics use or alcohol use for a significant amount of time").

A continuing pattern of illegal drug use, however, implicates most of the *Holley* factors and will support a finding that termination of parental rights is in a

20

child's best interest. *See, e.g.*, *In re N.J.H.*, 575 S.W.3d 822, 834–36 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (holding father's history of drug use and continued drug use during case bore on second, third, fourth, and seventh *Holley* factors—child's emotional and physical needs, emotional and physical danger to child, father's parental abilities, and stability of home—and supported best-interest finding); *In re K.P.*, 498 S.W.3d 157, 174–75 (Tex. App.—Houston [1st Dist.] 2016, pet. denied) (holding mother's continuing drug use, evidenced by repeatedly testing positive for drugs, bore on third, fourth, and eighth *Holley* factors—emotional and physical danger to child, mother's parental abilities, and parental acts or omissions indicating improper parent–child relationship—and supported best-interest finding); *Doe v. Brazoria Cty. Child Protective Servs.*, 226 S.W.3d 563, 567, 574–75 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (holding mother's drug addiction spanning seven or eight years and continuing drug use even after rehabilitation attempts bore on second, third, fourth, fifth, seventh, and eighth *Holley* factors—child's emotional and physical needs, emotional and physical danger to child, mother's parental abilities, programs available to assist parent to promote child's best interest, stability of home, and parental acts or omissions indicating improper parent–child relationship—and supported best-interest finding).

Here, the mother's history of illegal drug use spans more than a decade and continued through trial. The mother testified she first used cocaine around 2012. The

record does not disclose the details of her use in terms of its frequency or consequences, but it was significant enough to require rehab in 2016. The mother implicitly claims rehab was successful until 2019 or 2020, when she used cocaine again. However, she was arrested and charged with possession of cocaine before then in 2018. In any event, she and her child tested positive for cocaine when he was born in 2021, after which the Department initiated this termination proceeding. And the mother has repeatedly tested positive for cocaine and, more recently, methamphetamine throughout the pendency of this proceeding through 2023. Though many details are missing, a reasonable factfinder could conclude from this broad outline that the mother has not been drug-free for most of the past decade.

The full extent of the mother's illegal drug use is not clear from the record. But this lack of clarity is largely attributable to the mother, who repeatedly misrepresented her drug use. She initially denied using cocaine when her son was born. She lied to her substance-abuse counselor, so much so that the counselor refused to continue counseling her. The mother claimed to not be using illegal drugs or else to have stopped using them multiple times under oath during the pendency of this proceeding only to subsequently test positive for cocaine and methamphetamine. There was not a consecutive six-month period during the pendency of this case in which the mother's drug tests were negative for illegal drugs, and three tests late in the case—November and December 2022 and February

22

2023—were positive for illegal drugs. Notably, the December and February samples were collected the same days the mother testified at trial.

The record in this appeal discloses several circumstances from which the trial court may have reasonably found the mother's drug use was particularly serious.

First, the evidence shows the mother used cocaine while pregnant with the child. A mother's use of illegal drugs during pregnancy endangers the physical wellbeing of her unborn child. *See In re J.W.*, 645 S.W.3d 726, 733, 749 (Tex. 2022) (stating in case in which child's meconium tested positive for opiates, amphetamines, benzodiazepine, barbiturates, and methadone that mother's use of drugs while pregnant created dangerous environment for child). The mother denied she knew that she was pregnant at the time. But the trial court could have reasonably disbelieved her denial. Notably, a medical record indicates the mother was aware of her pregnancy in January 2021—at least six months before she gave birth. In addition, in the hospital the mother's urine tested positive for cocaine, and the expert testimony at trial was that a urine sample only detects drug use within a few days.

Second, the evidence shows that the mother's drug use involves so-called hard drugs—cocaine and methamphetamine in particular—rather than less destructive ones. *See* TEX. HEALTH & SAFETY CODE § 481.102(3)(D), (6) (including both cocaine and methamphetamine in Penalty Group 1 of controlled substances); *In re A.J.D.-J.*, 667 S.W.3d at 826 (distinguishing between hard drugs, like

methamphetamine, and less destructive drugs, like marijuana). A factfinder may reasonably attach greater significance to the use of more destructive narcotics. *See In re A.A.*, 670 S.W.3d 520, 530 (Tex. 2023) (noting that parental use of methamphetamine poses immediate danger to child's physical health and safety); *In re A.J.D.-J.*, 667 S.W.3d at 826 (holding that factfinder could reasonably find use of hard drugs was of more serious nature and directly implicated parental fitness). And though the mother denied the accuracy of the test results showing methamphetamine use, claiming they were false positives, a factfinder may reasonably credit laboratory drug test results over a denial of drug use. *See, e.g.*, *In re S.C.F.*, 522 S.W.3d 693, 703 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (holding trial court sitting as factfinder was entitled to credit lab reports and witness testimony over father's denial of drug use and his claim that positive drug test result was false).

Third, the mother has repeatedly relapsed into drug use despite multiple rehabilitative efforts. She went to rehab in 2016 but later began using cocaine again at some point. In 2021–22, she went through more than one round of substance-abuse counseling with Bradley but relapsed each time soon after counseling had ended. In general, a factfinder may reasonably infer from evidence of past illegal drug use that a parent is at risk for continuing drug use. *In re J.M.T.*, 519 S.W.3d at 269. When, as here, the evidence shows the parent returned to drug use after rehabilitation, the factfinder may reasonably find that the parent will, in all

24

likelihood, continue using drugs and therefore continues to pose a risk to his or her child's wellbeing. *See, e.g.*, *Cervantes-Peterson v. Tex. Dep't of Family & Protective Servs.*, 221 S.W.3d 244, 254–55 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (en banc) (holding mother's use of cocaine during pregnancy endangered child and failure to stay off drugs despite rehabilitative efforts allowed factfinder to reasonably find she could continue to endanger child in affirming trial court's best-interest finding). Under these circumstances, the factfinder may also reasonably find that the parent likely will not benefit from additional rehabilitative efforts. *See, e.g.*, *In re A.M.*, 495 S.W.3d 573, 581 (Tex. App.—Houston [1st Dist.] 2016, pet. denied) (stating that father's willingness and ability to improve was called into question by his positive test for methamphetamine use less than one month after he completed substance-abuse counseling).

Fourth, the evidence shows that the mother repeatedly tested positive for cocaine, and later methamphetamine, during the pendency of this case even though her drug use was what led to the removal of the child from her custody and despite being told that his return to her custody was contingent upon her being drug-free. A factfinder may reasonably find that a parent's continued drug use after removal of a child and with knowledge that his or her parental rights are at stake is especially salient because drug use under these circumstances shows either an inability or unwillingness to place the responsibilities of parenthood ahead of the parent's desire

25

to use drugs. *In re A.J.D.-J.*, 667 S.W.3d at 825. In addition, the factfinder may reasonably place more weight on this circumstance when, as here, a very young child is involved due to his or her relative helplessness and vulnerability. *See id.* (writing that parental intoxication is incompatible with care of very young children); *see also In re B.D.A.*, 546 S.W.3d 346, 361 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (describing four-, five-, and seven-year-olds as vulnerable due to ages).

Fifth, the mother has continued to use illegal drugs despite a prior drug-related criminal prosecution. In 2018, she was charged with possession of cocaine; this charge was dismissed only after she completed court-ordered services. In general, a parent's use of illegal drugs is indicative of instability in the home in part because it exposes a child not only to the possibility that the parent may be impaired but also to the possibility that the parent may be jailed. *In re N.J.H.*, 575 S.W.3d at 834–35. Here, the mother has confronted the possibility of jailtime but remains undeterred. A factfinder may reasonably find that the possibility of incarceration and the accompanying instability in the home are more than mere theoretical possibilities when a parent continues using drugs after a drug-related criminal prosecution. *Cf. In re K.C.M.*, 4 S.W.3d 392, 399 (Tex. App.—Houston [1st Dist.] 1999, pet. denied) (holding evidence factually insufficient to support termination due to evidence that mother who was jailed for drug offense had turned her life around afterward). We acknowledge that the mother insisted the cocaine she was prosecuted for possessing

was not hers, but the trial court was entitled to disbelieve her. *See, e.g.*, *Yonko*, 196 S.W.3d at 244 (holding that factfinder could have reasonably disbelieved mother's testimony denying responsibility for assault for which she was criminally charged).

Sixth, the evidence shows that the mother has lied about her continuing drug use in an effort to minimize or conceal it. A parent's continuing use of illegal drugs combined with a lack of candor about her continuing use poses a risk to a child's wellbeing. *See, e.g.*, *Wyatt v. Dep't of Family & Protective Servs.*, 193 S.W.3d 61, 70 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (stating that mother's lack of candor in drug assessment and continuing drug use exacerbated emotional and physical danger her misbehavior posed to her children). As Bradley, the mother's former counselor, testified at trial, the mother cannot benefit from counseling or rehabilitative efforts so long as she remains untruthful about her illegal drug use. A factfinder may reasonably discount a parent's asserted commitment to sobriety when the evidence shows the parent has been untruthful about her use of illegal drugs.

In sum, contrary to the mother's contention that virtually no evidence supports the trial court's best-interest finding, there is ample evidence from which a factfinder could reasonably find by clear and convincing evidence that she has a serious, longstanding drug problem, and that termination is in her child's best interest due to her serious, longstanding drug problem. *See* FAM. § 263.307(b)(8) (including "whether there is a history of substance abuse by the child's family" among factors

that "should be considered by the court" when "determining whether the child's parents are willing and able to provide the child with a safe environment"); *see, e.g.*, *In re A.C.*, 394 S.W.3d 633, 638, 642 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (holding strong evidence of pattern of cocaine use during pregnancy, after removal of child from mother's care, and after mother had drug treatment suggested mother was unwilling and unable to give her child safe environment, which is among primary considerations in deciding whether termination is in child's best interest); *Cervantes-Peterson*, 221 S.W.3d at 255 (holding use of narcotics during pregnancy and continued use afterward, standing alone, was legally sufficient to support factfinder's finding that termination of parental rights was in child's best interest).

We acknowledge that the evidence concerning issues other than the mother's drug use is largely not adverse to her. Thus, the record is by no means one-sided. For example, unlike parents in many other termination suits, the mother consistently visited her child, was bonded with the child (though apparently not as bonded with the child as the foster parents, whom the child refers to as "mama" and "dada") and has insisted that she desires to be reunited with her child throughout this case. The mother is employed, has stable housing, and wants to provide a home for the child.

Ultimately, however, this undisputed evidence does not tilt the balance in the mother's favor because the evidence as a whole shows that her sincere desire to be the parent of her very young child is compromised by her illegal drug use. *See In re*

*K.M.L.*, 443 S.W.3d at 116–17 (concluding that evidence was legally sufficient to support best-interest finding despite evidence that mother "had bonded with her child, loved and missed her child, and continued to check on the child"); *In re L.M.*, 104 S.W.3d 642, 648 (Tex. App.—Houston [1st Dist.] 2003, no pet.) (concluding evidence was factually sufficient to support best-interest finding despite evidence that mother "cared about her daughter and wanted custody of her"). One key factor that a factfinder should consider when evaluating whether termination of parental rights is in a child's best interest is "the willingness of a child's family to effect positive changes." *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). A factfinder could reasonably find on this record that the mother lacks the willingness or ability to overcome her illegal drug problem and therefore also lacks the ability to realize her sincere aspiration to be an effective parent to her child.

Moreover, another key factor a factfinder should take into account is "the stability of a proposed placement." *In re R.R.*, 209 S.W.3d at 116. It is undisputed that the child's foster parents provide him with a safe, stable, drug-free home. In contrast, the evidence establishes that the mother, whose drug test results show she was still using drugs when this suit was tried, cannot provide her child with a drug-free home now, and a factfinder could reasonably find based on the evidence as a whole, including the mother's repeated relapses and lack of candor about her drug use, that she in all likelihood will not be able to provide her child with a drug-free

home in the future. As the best-interest inquiry is child-centered, we cannot discount or minimize the level of permanence the child has with his foster parents. *See In re J.W.*, 645 S.W.3d at 747 (saying court could not discount or minimize permanence achieved by child who had lived with his foster family since he was one month old).

We also acknowledge that the record contains evidence that the mother remains involved in the care and upbringing of her 13-year-old son, though he apparently does not currently reside with her. The mother urges this court to take into consideration the fact that termination of her rights as to her younger son could adversely impact the relationship between the boys. She also suggests that termination of her rights here would be inappropriate because the Department has not likewise sought termination of her parental rights with respect to her older son.

We reject the mother's position for at least three independent reasons.

First, the evidence concerning the mother's role in her older son's life generally consisted of her own testimony and the testimony of her friend Vivian. As the sole judge of witness credibility, the trial court sitting as factfinder could have disbelieved their testimony in whole or part. In this regard, we note that the mother potentially undermined her own credibility by being untruthful on other matters. As to Vivian, though she said she had known the mother for three years, Vivian testified that she did not know the mother was using drugs during this period. A factfinder

30

could have reasonably found this testimony called into question either Vivian's truthfulness or the extent of her knowledge about the mother's parental fitness.

Second, while we agree that termination of the mother's rights as to her younger son but not her older one is somewhat incongruous, we can only address the appeal before us, which solely concerns her rights as to the younger son. As we have held before, "best-interest determinations must be made individually, on a child-by-child basis, even with respect to children in the same family." *In re A.J.D.-J.*, 667 S.W.3d at 835. Hence, when a parent's rights as to multiple children are at stake, the evidence can result in the parent losing his or her parental rights as to one child but not others, whether in the same or different proceedings. *See id.* at 835–36. Here, only the mother's rights as to one of her two children is at issue. This procedural posture does not logically compel a factfinder to refrain from terminating the mother's parental rights on the basis that it can only do so with respect to one child rather than both. *See id.* (concluding that decree that did not terminate mother's parental rights as to other children rendered in one parental-termination suit did not compel same result as to another child in different parental-termination suit).

Finally, we reject the mother's position because, on the facts before us, it effectively constitutes a plea to leave her younger son in limbo indefinitely. As we have observed in the past, the "need for certainty and permanence, including the establishment of a stable home and familial relationships, is the paramount

31

consideration in a best-interest decision." *Id.* at 834; *see also* FAM. § 263.307(a) (providing that prompt and permanent placement of child in safe environment is presumed to be in child's best interest). Certainty and permanence cannot be achieved as long as the mother retains her rights, and the factfinder was not obliged to opt for a disposition less severe than termination in the face of clear and convincing evidence that the mother has a continuing drug problem that likely will prevent her from discharging her parental responsibilities going forward. *See In re M.S.*, 115 S.W.3d at 548 (stating child has interest in rendition of final decision so that adoption to stable home or return to parents is not unduly prolonged).

## CONCLUSION

In conclusion, viewing all the evidence in the light most favorable to the trial court's best-interest finding and considering undisputed contrary evidence, we hold the trial court could have reasonably formed a firm belief or conviction that termination of the mother's parental rights is in the best interest of the child. Therefore, the evidence is legally sufficient to support the termination decree. Furthermore, in view of the entire record, we hold the disputed evidence the trial court could not have reasonably credited in the best-interest finding's favor is not so significant that the trial court could not have formed a firm belief or conviction that termination of the mother's parental rights is in the best interest of the child. Thus, the evidence likewise is factually sufficient to support the termination decree.

We affirm the trial court's decree terminating the mother's parental rights.

Gordon Goodman
Justice

Panel consists of Justices Goodman, Rivas-Molloy, and Guerra.